THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF HINSDALE v. THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF MINERAL.

1. STATUTORY CONSTRUCTION.

To ascertain legislative intent, the court must consider, not isolated words and expressions, but the entire statute, and the physical conditions to which the act is to be applied, and which are presumed to have been known to the legislature, may be taken into consideration.

2. SAME—COUNTY BOUNDARIES.

It is provided by the act of April 4, 1887, that it shall be the duty of the state engineer, in specified cases, in connection with the county surveyor of each county claiming the same territory by reason of an indefinite description of the boundary line, "to run out and establish such lines as nearly as may be, in accordance with such defective description, and to fix and define such boundary line, by plain and substantial mounds and marks, and unmistakable natural monuments," etc.; and also that when such line shall be established, it shall be the boundary line between the counties, unless one of them shall, within six months from the filing of the description, commence an action in a court of competent jurisdiction to determine such disputed line. *Held*, that an actual survey on the ground is not an imperative requirement, and that when the officers have defined a line described by unmistakable natural monuments, they have run it out and established it within the meaning of the law.

3. SAME.

The above-mentioned provision is not repugnant to the constitution as an attempt to vest judicial power in the state engineer and assisting surveyors, or to authorize the deprivation of a person's property without due process of law.

4. SAME.

Whenever a disputed county boundary line has been run out and established under the provisions of the act above referred to and no action has been commenced by either county to determine the same within six months after the filing of the engineer's report, the report becomes the only evidence of the boundary, and it is conclusive of the question.

*Appeal from the District Court of Chaffee County.*

Mr. S. D. CRUMP and Messrs. PATTERSON, RICHARDSON & HAWKINS, for appellant.

Mr. ALBERT L. MOSES, Mr. IRA J. BLOOMFIELD and Mr. CHARLES S. LIBBY, for appellees.

ON REHEARING.

THOMSON, J., delivered the opinion of the court.

It is due to the learned counsel of both parties to this litigation to say that they have conducted the controversy throughout with marked ability and fairness, and have defined their respective positions so clearly that we are left in no doubt as to the exact points of difference between them. We have carefully reëxamined the case as it was originally presented, and we have also devoted considerable time to the study of the new questions discussed on the rehearing; and while our former conclusions remain unchanged, in view of the fact that certain terms and expressions which we at first employed have apparently occasioned some misconception of the meaning we intended to convey, we have deemed it advisable to formulate our views in a new opinion, which, perhaps, shall be more intelligible, and, certainly, more satisfactory to ourselves.

The county of Mineral was created by an act of the legislature, approved March 27, 1893 (Session Laws 1893, p. 94). It was formed from territory before that time belonging to the counties of Hinsdale, Rio Grande and Saguache. Section 8 of the act reads as follows:

"The present indebtedness of Hinsdale, Rio Grande and Saguache counties shall be apportioned between the counties of Hinsdale, Rio Grande and Saguache and the county of Mineral, in proportion to the ratio which the taxable property of that portion of Hinsdale, Rio Grande and Saguache counties as the same may be, which is now included within the boundaries of Mineral county, bears to the taxable property of Hinsdale, Rio Grande or Saguache county, as the case may be, as shown by the assessment rolls for the year beginning January 1, 1893."

This action was brought, in pursuance of the foregoing

section, by the board of county commissioners of Hinsdale county, against the board of county commissioners of the county of Mineral, to recover the proportion of the indebtedness of Hinsdale county with which Mineral county was alleged to be chargeable. The trial was by the court, and resulted in a judgment for the defendant, from which the plaintiff appealed to this court.

The only matter in controversy in the case is the area of territory received by Mineral county from Hinsdale. Whether, in respect to such area, the contention of the plaintiff or that of the defendant is to prevail, the amount due from the former county to the latter is easy of ascertainment, and depends entirely upon the settlement of the dispute concerning the boundaries. From the counties into which the southern portion of Colorado was originally divided by the territorial legislature, new counties were subsequently, from time to time, created, and, among others, the counties of Hinsdale, Rio Grande and Saguache. These counties were described, in part, by reference to the boundaries of older counties, and portions of the boundary lines of the latter were likewise dependent upon other boundaries. In the description of Mineral county the boundary lines of Rio Grande, Saguache and Hinsdale counties were used. To find the boundary lines of counties so described, those of others must be known, and to accurately bound some of them would require the examination of a succession of statutes, commencing with the first division of the territory into counties. An exhaustive argument from these statutes has been made in behalf of each of the parties, on the hypothesis that they might control, or at least influence, our decision. But there was in evidence the record of a statutory proceeding, instituted by the several counties from which Mineral county was taken, to establish the boundary lines between them; and if that proceeding was a valid proceeding, we conceive that the lines which it resulted in defining cannot now be questioned. If it can be sustained, the determination of this controversy turns upon it.

The following is section 1 of an act of the legislature, approved April 4, 1897 :

" That whenever the boundary lines of any county in this state shall be so indefinite that a portion of territory, by reason of such indefinite description, is claimed by two counties, and such fact shall appear by petition of the board of commissioners of either county, to the state engineer, it shall be the duty of such state engineer, in connection with the county surveyor of each such counties, to run out and establish such lines as nearly as may be, in accordance with such defective description, and to fix and define such boundary line, by plain and substantial mounds and marks, and unmistakable natural monuments, and to furnish the board of county commissioners of each of said counties with a description of such line as soon thereafter as may be practical ; and when such line shall be established, it shall be the boundary line between said counties, unless one of said counties shall, within six months from the day of filing the description of said line, by the state engineer, with the board of county commissioners of such county, commence an action in a court of competent jurisdiction in this state, to determine and settle such disputed line, and prosecute the same with due diligence until its final determination, or shall have settled such disputed line, within said six months by arbitration, as is now provided by law; *provided*, that if the county surveyor of either of such counties shall not appear and assist the state engineer in making such survey after due notice so to do, it shall in no manner affect or invalidate such survey, or the boundary lines as they may be fixed by such state engineer." Session Laws, 1887, p. 238.

Attempting to follow the provisions of this statute, the board of commissioners of Saguache, Rio Grande and Hinsdale counties severally petitioned the state engineer for the survey and establishment of the uncertain and indefinite boundary lines between those counties. The state engineer duly notified the county surveyor of each of the counties to appear and assist him in making the survey ; and, in pursu-

ance of the notice, the state engineer, the county surveyor of Saguache county, the deputy county surveyor of Rio Grande county, and the county surveyor of Hinsdale county, on the 16th day of March, 1892, met at the town of Creede, situated in the territory in controversy between Hinsdale and Saguache counties, for the purpose of establishing and defining the disputed boundaries. The final outcome of their proceedings was a written report, rendered by the state engineer to the board of commissioners of each of the counties, in which the boundaries as established by himself and his assistants·were described and defined. The report was accompanied by a map or plat on which those boundaries were shown.

The report set forth and compared the statutes describing the counties, a knowledge of whose boundaries the engineer and surveyors deemed necessary to the ascertainment of the particular county boundary lines they were called upon to establish and define; and gave the reasons, derived from those statutes, for the descriptions and definitions which they made of the disputed lines.

The validity of this report was originally attacked upon two grounds. The first was that a construction of the statutes was outside of their authority, and that, as such construction was the controlling feature in their proceedings, the report was void. We shall examine this ground of objection when we come to the consideration of the questions raised on rehearing, in connection with which we think it can be more intelligently discussed. The second objection is that the engineer and surveyors, in the manner in which they assumed to run out and define the disputed lines, failed of compliance with the statute in material particulars. While they defined the boundaries by natural monuments in accordance with the statutory provision, and in such manner that there can be no mistake as to where the lines may be found, yet they made no survey on the ground. Counsel contend that the statute imperatively requires such survey; and, relying upon the well-known maxim that if an affirmative statute which is introductory to a new law directs a thing to be·done in a cer-

tain manner, that thing shall not, even though there are no negative words, be done in any other manner, they maintain that the failure to make an actual survey invalidates the report.   We are disposed to doubt the applicability of the maxim to a case like this.   The legislature contemplated that the work might be incorrectly done, because it provided that a dissatisfied county might disregard the report, and institute an original proceeding to determine and settle the disputed lines.   In such suit the question where the lines should be laid would be determined without reference to the action of the engineer and surveyors.   The conclusion reached in the suit might be that lines entirely different from those designated by them were the true statutory lines. . If such should be the result, it would be because, intentionally or otherwise, they disregarded the requirement of the law to follow the statutory description.   That requirement is as mandatory as any contained in the statute, and, in failing to conform to it, they would be doing an act in a manner different from that directed by the law.   We can conceive of no controversy over a county boundary unrelated to its true location, and where the final conclusions of a court as to that differ from those of the engineer and surveyors, it is because the latter have not done their work in the manner prescribed.   Yet, notwithstanding the results reached by them might be found to be incorrect, and their action erroneous, unless the county feeling itself aggrieved should proceed by suit or arbitration to a judicial settlement of the controversy within the period limited by the statute, their acts would be valid, and the line designated, erroneously or not, by them, would thenceforth be the indisputable boundary line.   It is for these reasons, drawn from the language of the statute itself, that we are inclined to think that the maxim referred to is not properly applicable to this case.

But on the hypothesis that we are wrong in this, and conceding that to give the proceedings of the engineer and surveyors any validity, the statutory requirements must have been exactly conformed to, yet, upon what we conceive to

be a reasonable construction of the statute, we think, from the evidence before us, that the engineer and his assistants kept themselves entirely within it. Counsel insist that by the words "run out" is meant the making of an actual survey upon the ground of the whole line. To ascertain the legislative intent, we must consider not isolated words or expressions, but the entire statute ; and it is proper also to take into consideration the physical conditions and characteristics of the country to which it is to be applied, and which are presumed to have been known to the legislature at the time of its enactment. Let us see, then, whether the words "run out" necessarily mean what counsel claim they do.

The rights of the parties to this action depend entirely upon the legal location of the boundary line between Hinsdale and Saguache counties as it was before Mineral county was created. The ascertainment of that line determines the amount of territory that Mineral county received from Hinsdale, and, consequently, furnishes a rule by which the indebtedness of the former county to the latter may be estimated. The act creating Hinsdale county, in describing the line which should divide it from Saguache county, commences at the point of intersection of the New Mexico principal meridian with the southern boundary of Saguache county, and proceeds thence westerly along the southern boundary of Saguache county to the 107th meridian west from Greenwich, and thence north along that meridian to a point ten miles north of the 38th parallel of north latitude. The only part of this description which can be said to be indefinite is that which relates to the southern boundary of Saguache county, and it is only in case of a dispute arising out of an indefinite description that the statute can be invoked. The engineer and surveyors defined this portion of the line as commencing at the intersection of the New Mexico principal meridian with the southern boundary of Saguache county on the summit of the Continental Divide, and proceeding thence westerly along the Continental Divide to its intersection with the 107th meridian of west longitude. They thus laid the south-

ern boundary of Saguache county, and consequently the
northern boundary of Hinsdale county, along the summit of
the range of mountains known as the "Continental Divide,"
between those two meridians.   In behalf of the defendant it
is contended, for reasons drawn from the language of several
statutes, describing boundaries upon the location of which
the true southern boundary of Saguache county depended,
that this boundary was considerably farther south than the
summit of the Continental Divide, and pursued the middle
of the current of the Rio Grande between the two meridians.
Now suppose, for purposes of illustration, that the engineer
and surveyors had found this, instead of the summit of the
divide, to be the southern boundary of Saguache county,
then, upon counsel's theory of the statute, they must have
gone into the middle of the river with their instruments, and,
traveling in the water, made an actual survey of the line from
one end to the other.   The statute makes no exception, and
if a line cannot be run out without an actual survey, then
that kind of survey must be made in every case.   But to
make such a survey in that river is probably an impossibil-
ity; and, even if it were possible, nothing would be gained
by making it.   The line would be no more visible, no more
accurately defined, and no better known after than before
the survey.   The river is a natural, permanent and unmis-
takable monument; and to name it as the line is to run out
the line, and at the same time define it.   To assume that the
legislature ever contemplated an actual survey in such a case
would, to our minds, be absurd.   In every case, without ex-
ception, of a county boundary in dispute by reasons of indefi-
nite description, the engineer and surveyors must, when
legally convened, run out the line, regardless of natural con-
ditions; and if there is a single case in which an actual lay-
ing out of the line upon the ground would be an impossibility,
or an absurdity, then we are driven to the conclusion that
counsel have attached a forced meaning to the words ": run
out," and that the running out of a line, and a passing over
it physically, are not necessarily one and the same thing.

The existence of one such case is fatal to the whole argument.

It seems evident to us that the sole purpose of the statute was to provide a method for settling a dispute by making certain and definite a description which was before uncertain and indefinite. The fact to be ascertained is, which one of different lines, claimed as boundaries, is the true statutory line. To find the meaning of the words "run out," the connection in which they occur must be considered. The engineer and surveyors are required to "run out and establish such lines as nearly as may be, in accordance with such defective description." The object of this requirement is to confine them to lines which they shall find described in the statute, —to deprive them of all discretion in the matter of the location of boundaries. Its controlling feature is the establishment of the lines in accordance with the description. The expression "run out and establish" is introductory to the words "in accordance with such defective description;" and the intention was to prescribe the limits within which they should act, rather than the specific manner of their action. In our opinion, the words "run out" were not intended to have any mere technical signification.

Whether it is necessary, in order to the adjustment of a boundary, to run it out upon the ground, depends upon the nature of the country through which the line runs. The absence of prominent physical features would probably require that course to be pursued, so that an accurate description could be made; and in such case, for want of well-known natural objects, it would be necessary to erect artificial mounds or monuments to define it as the statute directs; but where lines have been drawn and unmistakably defined by nature, if a disputed boundary falls upon one of them, its designation as the true line, naming known points as its termini, and giving its course, is a running out and establishment of the line. The line is run out by adopting the one run out by nature. The summit of a mountain range is a natural line; no manual work upon it can define it any better than it is

already defined. It is far more conspicuous than a line marked by artificial mounds can be. It is itself a natural monument, or, perhaps, a succession of natural monuments, within the meaning of the statute, and the only running out that is necessary to its establishment as a legal line is a running out in its description and on accompanying plats. Following the same line of reasoning, the word "survey," as the statute uses it, does not of necessity mean an actual survey. Our firm opinion is that when the engineer and surveyors described the boundary line between Hinsdale and Saguache counties as lying along the summit of the Continental Divide, between the New Mexico principal meridian and the 107th degree of west longitude, they ran out and established the line, and fixed and defined it, within the meaning of the law.

The validity of the action of the engineer and surveyors is now assailed upon the ground that the statute authorizing it is repugnant to the constitution. This view of the case was first called to our attention and elaborated in the argument on the rehearing. It is said that the statute attempts to clothe the state engineer and his assistant surveyors with judicial power, and is therefore in conflict with section 1, article 6, which provides that the judicial power of the state, as to matters of law and equity, shall be vested in a supreme court, district courts, county courts, justices of the peace, and such other courts as may be provided by law. The argument, as we understand it, is that the statute did not invest the engineer and surveyors with some of the indispensable attributes of a court, hence they could not be one of the " other courts " for which the legislature is authorized to provide; and as judicial functions can be exercised only by courts, no judicial authority could be bestowed upon them. We agree with counsel that the act providing for the establishment of disputed county boundaries does not operate to create a court. It provides for no trial of controverted questions before the engineer and surveyors, and does not empower them to render any judgment. There are no parties to their

proceedings in the legal sense of the term, and no process is issued. Their action is not final, and yet there is no appeal from it, nor any method by which their proceedings may be reviewed. The question, then, is whether the statute attempts to clothe them with judicial power. To determine this, we must inquire what are the duties which the statute devolves upon them. The conditions of their acting at all are, first, an indefinite description of a county boundary by reason of which the same territory is claimed by different counties; and, second, a petition to the state engineer by the board of commissioners of one of the counties, setting forth the fact of the controversy, and the reason for it. Having the necessary statutory authority to act, it is then the duty of the engineer, in connection with the county surveyor of each of the interested counties, to run out and establish the lines as nearly as may be in accordance with the defective description, and to fix and define them by plain and substantial mounds and natural monuments, furnishing the board of commissioners of each of the counties with a description of the lines. With the exception of a subsequent section, which denies them authority to change a county line, and which really adds nothing to what is contained in the first section, this is all the statute says upon the subject. The running out and defining of a line is not in itself a judicial act. But in order to find where the line should be established, the statute bearing upon the question must be consulted, because there is no authority outside of the legislature to create counties and assign them boundaries, and it is the statutory boundaries that must be ascertained and followed. An examination of the statutes by the engineer and his assistants is therefore the first step to be taken in the performance of their duties. To deduce from them the line sought for involves, in some sense, their construction, or an interpretation of their language. Now, it is said that the construction of statutes is the exercise of a judicial function, and that this act, in prescribing duties of which statutory construction is a necessary part, confers judicial power, and hence is con-

trary to the constitution.  The engineer and his assistant
surveyors are supposed, by virtue of their occupation, to be
familiar with the country in which they are called upon to
act, and with its physical characteristics and landmarks.
They hear no evidence and no argument; they do not even
listen to the statements of the contending parties, but act
solely upon their own knowledge and the information they
are able to obtain from the statutes.  They do not examine
a statute to pass upon its legal effect, but to find facts.  In
a restricted sense, they may be said to construe it, but the
knowledge necessary to a construction of that kind is a
knowledge derived from their calling, and from experience
gained in their calling, and not a knowledge of the principles
of law.  We may concede that construing a statute in that
way, and for that purpose, is *quasi* judicial, but it is not judi-
cial in the sense in which the term is applied to proceedings
in courts.  There is something more than that involved in
the judicial construction of a statute.  An authority to gather
from descriptions of boundaries contained in statutes the
data of fact necessary to an intelligent performance of sub-
sequent duties, even though it contemplates an exercise of
judgment, is not a judicial power within the meaning of the
constitution.

In *United States v. Ferreira*, 13 How. (U. S.) 40, a case
involving the nature of powers conferred by congress upon
certain judges as individuals, and upon the secretary of the
treasury, to adjust the claims of Spanish officers and indi-
vidual Spanish inhabitants of Florida against the United
States, under the provision of the treaty of 1819, by which
Spain ceded Florida to the United States, Chief Justice Taney
said :

" The law of 1823, therefore, and not the stipulations of
the treaty, furnishes the rule for the proceedings of the ter-
ritorial judges, and determines their character.  And it is
manifest that this power to decide upon the validity of these
claims, is not conferred on them as a judicial function, to be
exercised in the ordinary forms of a court of justice.  For

there is to be no suit; no parties in the legal acceptance of the term, are to be made, no process to issue; and no one is authorized to appear on behalf of the United States, or to summon witnesses in the case. The proceeding is altogether *ex parte*, and all that the judge is required to do, is to receive the claim when the party presents it, and to adjust it upon such evidence as he may have before him, or be able himself to obtain. * * * The powers conferred by these acts of congress upon the judge as well as the secretary, are, it is true, judicial in their nature. For judgment and discretion must be exercised by both of them. But it is nothing more than the power ordinarily given by law to a commissioner appointed to adjust claims to lands or money under a treaty; or special powers to inquire into or decide any other particular class of controversies in which the public or individuals may be concerned. A power of this description may constitutionally be conferred on a secretary as well as on a commissioner. But it is not judicial in either case, in the sense in which judicial power is granted by the constitution to the courts of the United States."

We have been cited to *People ex rel. v. Chase*, a case decided by the supreme court of Illinois, and reported in the Chicago Legal News, of date November 14, 1896, as condemnatory of the statute under consideration. Let us see whether such is its effect. In that case the question was whether an act of the legislature of Illinois, conferring upon a registrar, assisted by two examiners, after notice given as the statute required to all persons interested, an authority which amounted to a power to inquire into and determine titles to real estate, limiting the right of dissatisfied claimants to bring suit for the assertion of their interests to five years from the time of the decision, was in consonance with the constitution. The court held that the authority conferred was judicial within the meaning of the constitution, because it empowered the registrar and his assistants to consider and apply the law to the facts presented by the applicant. By virtue of the statute, they were authorized to determine all

questions of law and fact arising in any particular case. · As the constitution confined the exercise of judicial power to certain designated courts, and as this special tribunal was unknown to the constitution, the statute creating it was held void. That the authority with which the legislature attempted to clothe that tribunal was judicial, in the sense in which the proceedings of courts are judicial, is hardly open to question; and in such respect the distinction between the Illinois statute and our own is manifest. But, apparently for the purpose of rendering a misapprehension of the intended effect of the decision impossible, the court took occasion to say: "We are not unmindful of the well-settled rule that there are many cases in which ministerial officers exercise *quasi* judicial powers, and yet the laws conferring them are held to be no violation of the constitutional provision under° consideration."

By the terms of the law of 1887, the engineer and surveyors had authority, *ex parte*, to establish the boundary line in question, taking the data on which to proceed from the statutes affecting the question of location of the boundary; and, having established this boundary and defined it, and furnished the board of commissioners of the several counties with its description, their duties were at an end. Neither of the counties was bound by their acts; but either county might, within six months after the filing of the description, commence a suit, not to overthrow any supposed decision made by them, but, ignoring their action entirely, to determine and settle the disputed line as in an original proceeding. The failure to proceed within the period limited had the effect to convert the line established by them into the boundary line between the counties, not because their action upon the dispute was in the nature of a judicial determination, but because, after the expiration of the designated period, the suit provided for was barred. The legislature merely fixed a time beyond which the controversy should be at rest. It deprived no county of any right it ever possessed to a judicial determination of the controversy; but, as is provided by

statute in reference to other actions, it designated a period after which proceedings would not be entertained. We are unable to say that the statute is obnoxious in any respect to section 1, article 6, of the constitution.

Next it is said that the act is in violation of the provision of the bill of rights that no person shall be deprived of life, liberty or property, without due process of law. It is contended that the authority granted to the state engineer, and the surveyors with whom he is to act, amounts to a power summarily to take territory from one county and give it to another. Even supposing that territory embraced within the boundaries of a county can with any propriety be called its property, we are unable to find any justification for this contention in the language of the statute. The purpose of the act is to assign to each contending county the exact territory to which it is lawfully entitled,—no more and no less. The authority is specifically limited to ascertaining, establishing and defining boundaries created by act of the legislature, and which could exist only by virtue of statute. How, then, can it be said that there is even latent in this statute an authority by which a county may be deprived of its property at all? But counsel seek to give force to their argument by reference to some of the facts brought out in this particular case. Counsel say that for some time before the attempted boundary adjustment, Saguache county had exercised dominion over the territory in dispute, and had claimed, and successfully asserted, the right to collect taxes in that territory. It does not appear that the claim was ever the subject of adjudication, or that the right which counsel say was "successfully asserted" was asserted in the courts. If Saguache county exercised such authority, it simply assumed it, acting on its own construction of the statutes; and in so far as it exercised dominion over territory which did not belong to it, its assertion of its alleged right was usurpation. Saguache county is not a county by prescription. It was created by statute. Outside of statute it has no existence, and all its territorial rights are derived from statute. It has, and can

have, no territory except what the statute gives it. When it petitioned the state engineer for the adjustment of its disputed boundary, it confessed that it was uncertain where the statutory boundary was, and whether the territory in dispute belonged to it or not. It placed itself on an exact level with the opposing claimant of the territory. That its claim of boundary was not acquiesced in by Hinsdale county is evidenced by the fact that the latter county also petitioned for an adjustment of the same boundary. There were opposing claims to the territory, and if it could possibly be said that the acts of dominion exercised by Saguache county over this territory invested that county with any rights, legal or equitable, it waived those rights by invoking the action of which counsel complain.

Nor, even on counsel's theory that Saguache county had some kind of property in the disputed territory, was it deprived of its property without due process of law, or deprived of it at all, within the meaning of the bill of rights. The action of the engineer and surveyors did not settle the question of boundary. If Saguache county was satisfied to abide their action, and accept it as final, then it relinquished its property, and was not deprived of it. But it had the right to disregard their action,—to consider it as not having been taken,—and by an original proceeding in a court having jurisdiction, or by arbitration, procure a judicial determination of its claim. Every constitutional right was preserved to it. From its failure to institute the suit or cause the arbitration to be had, it is presumed that it acquiesced in the action of the engineer and surveyors, and accepted the boundary which they fixed; and it is not here complaining now. An individual cannot properly be said to be deprived of property belonging to him but in an adverse possession, when he loses it by his neglect to reclaim it within the legal period, except in so far as he deprives himself of it by failing to assert his rights in time.

In *Townsend v. Radcliff*, 63 Ill. 9, the court held a statute constitutional which provided for the appointment by the cir-

cuit court, on the application of one of the parties interested, of a commission of surveyors to permanently establish the boundaries between lands of individuals, because they were required to report their proceedings to the court, and upon objections made denying correctness of the report, thus forming an issue of fact, a trial could be had before the court, or a jury, if one should be demanded, in which, upon all the evidence produced, the rights of the contending parties could be determined. It was also decided that if no objection was made, the report was final, because the parties would be presumed to acquiesce in its correctness. The statute was held valid on the ground that the question involved in the dispute might be fully inquired into and determined, in the manner contemplated by the constitution, by the court having jurisdiction. The principle of that case applies to this. There the aggrieved party might, on the filing of the report, make his objections. Here, as there is no provision for filing the report in a court, the party may, within a specified time, commence a suit, or procure an arbitration. In both cases a full determination of the controversy could be had in the manner authorized by the constitution ; and in both cases, by a failure within the proper time to proceed in the prescribed manner, the parties would be concluded by the report, and could not afterwards question it.

In *Belcher v. Farrar*, 8 Allen, 325, the court sustained a statute authorizing a board of selectmen to prohibit the exercise within the town of a trade or employment which they deemed a nuisance, without notice to the interested parties, on the ground that it provided also that persons aggrieved by the order might appeal from it, "and have the whole matter involved in the issue tried by a jury." But if the parties would escape the effects of the order they must appeal. Notwithstanding it affected their property rights, and was made without notice, and therefore without opportunity to them to be heard, if they desired to be relieved from it, the burden was upon them to bring the case into the proper court and have it adjudicated.

No suit was ever brought, or arbitration had, to determine the boundary line in controversy; so that, by the terms of the statute, at the time of the commencement of this action, the line established by the engineer and surveyors was the boundary line between Hinsdale and Saguache counties. We have gone over the entire ground embraced in the argument, and are compelled to disagree with the defendant's counsel at every point.

The plaintiff relied upon the line established by the engineer and his assistants, and introduced all its evidence upon the hypothesis that it was the legal boundary. The defendant claimed the Rio Grande as the true boundary. On the defendant's theory the indebtedness of Mineral county to Hinsdale would be much smaller than it would be on the theory of the plaintiff. The plaintiff denied that the Rio Grande was the boundary, and introduced no evidence of what the indebtedness would be if that river should be the line. The trial court adopted the defendant's theory. It held that the proceedings of the state engineer and his assistant surveyors were void. Upon an independent investigation of the statutes, and upon the testimony of witnesses, it found that the Rio Grande was the dividing line between the counties; and then, because the plaintiff had offered no evidence of what the indebtedness would be if that was the line, the court rendered judgment dismissing the case. We think the court erred in rejecting the report of the state engineer, and in its final judgment. By reason of the failure to have the question adjudicated as the statute provides, that report became the only evidence of boundary, and it should have been received as conclusive of the question.

For the reasons which we have given, the judgment must be reversed.

*Reversed.*

REED, P. J., concurs.

BISSELL, J., dissents.